**GENERAL ELECTRIC COMPANY,**
Appellant,

v.

**AMERICAN BUYERS COOPERATIVE,**
Inc., Appellee.

Court of Appeals of Kentucky.

June 20, 1958.

Rehearing Denied Oct. 24, 1958.

Bullitt, Dawson & Tarrant, John E. Tarrant, Thos. S. Dawson, Louisville, for appellant.

Charles Wylie, Wm. E. Sloan, Lexington, amici curiae for appellant.

Herbert H. Monsky, Louisville, for appellee.

Robt. M. Coleman, Coleman, Harlin & Orendorf, Bowling Green, Richard L. Garnett, Glasgow, amici curiae for appellee.

STANLEY, Commissioner.

The appeal brings before us the constitutionality of the statute which regulates the resale price of commodities, generally called the Fair Trade Act. KRS 365.080 and 365.090. The statute was enacted at the Fourth Extraordinary Session of the 1936 Legislature. Ch. 24, Acts. It is patterned after statutes of other states. See Note, 19 A.L.R.2d 1139. The trial court held the second section of the Act, KRS 365.090, to be unconstitutional. The validity of the entire act was debated on the appeal.

The material part of the first section, KRS 365.080, is copied for ready reference.

"(1) No contract relating to the sale or resale of a commodity that bears, or the label or content of which bears, the trade-mark, brand or name of the producer or owner of the commodity and that is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of this state by reason of any of the following provisions that may be contained in such contract:

"(a) That the buyer will not resell any such commodity except at the price stipulated by the vendor.

"(b) That the producer or vendee of a commodity will, upon the sale of such commodity to another, require the purchaser to agree that he will not, in turn, resell except at the price stipulated by the producer or vendee."

Provisions excluding certain transactions from the operation of the act are irrelevant here.

The second section of the Act, KRS 365.090, reads:

"Willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of KRS 365.080, whether the person so advertising, offering for sale or selling is or is not a party to the agreement, is unfair competition and is actionable at the suit of any person damaged thereby."

The General Electric Company brought this suit against American Buyers Cooperative, Inc. to enjoin it from doing what is charged to be in violation of the statute and to recover damages therefor. The court sustained the defendant's motion for a summary judgment on the ground of unconstitutionality of the second section of the statute KRS 365.090, and dismissed the complaint.

General Electric Company (hereinafter GE), as is well known, manufactures small electric household utilities and appliances that are trade-marked and bear the brand "General (GE) Electric." The articles are sold by GE to franchised wholesale distributors who in turn sell them to retail dealers. The appliances are in fair and open competition in Louisville and elsewhere throughout the country with commodities of the same general class produced and sold by others. GE has expended large sums of money in the development of its appliances of a high quality and in promoting and advertising them and its trade-mark. As the result, its appliances have become widely and favorably known, and GE has established a valuable reputation and good will for its appliances and its trade-mark. The retail dealers handling the articles benefit from the reputation and good will associated with the appliances.

GE has entered into agreements with many retail detailers in Louisville and elsewhere in Kentucky, which agreements provide that GE appliances shall not be advertised, offered for sale or sold by the dealer at less than the minimum retail resale prices stipulated by GE. These agreements were in effect at all times material to the case. Such agreements are commonly referred to as Fair Trade Agreements,

and all are in the same form, a copy of which is filed with the complaint as an exhibit.

The defendant, now appellee, American Buyers Cooperative, Inc. (hereinafter ABC), is engaged in the general business of selling merchandise, including electric appliances, at retail in Louisville, Kentucky. ABC has never signed a Fair Trade Agreement with GE and occupies the position of a nonsigner. GE notified ABC on several occasions of the existence of its Fair Trade Agreements in effect in Kentucky and of the minimum retail prices stipulated pursuant to such agreements. ABC received such notices and thereafter sold GE appliances at less than the minimum retail prices so stipulated.

The foregoing are the admitted facts of the case. They bring into application KRS 365.090.

This so-called Fair Trade Act, in the same or similar language, has been enacted in most of the states. It has been assailed everywhere as violating constitutional rights. The various courts have reached different conclusions as to its constitutional validity and vary in their reasons for the decisions, pro and con. The cases may be found in the opinions and appended annotations in the American Law Reports. See Doubleday, Doran & Co. v. R. H. Macy, 269 N.Y. 272, 199 N.E. 409, 103 A.L.R. 1325; Joseph Triner Corp. v. McNeil, 363 Ill. 559, 2 N.E.2d 929, 104 A.L.R. 1435; Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109, 106 A.L.R. 1476; Bourjois Sales Corp. v. Dorfman, 273 N.Y. 167, 7 N.E.2d 30, 110 A.L.R. 1411; Ely Lilly & Co. v. Saunders, 216 N.C. 163, 4 S.E.2d 528, 125 A.L.R. 1308; Schwegmann Bros. v. Calvert Dist. Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, 19 A.L.R.2d 1119; Bristol-Myers Co. v. Picker, 302 N.Y. 61, 96 N.E.2d 177, 22 A.L.R.2d 1203.

In order to focus attention upon the specific character of the particular statute with which we are dealing, we may point out that it is unlike our statute that condemns the sale of commodities below cost or the giving of rebates and the like for the purpose of injuring a competitor or as tending to destroy competition. KRS 365.-050 et seq. See Jefferson Ice & Fuel Co. v. Grocers Ice & Coal Storage Co., Ky., 286 S.W.2d 80, 54 A.L.R.2d 80. And although comparable, the statute relating to minimum mark-up resale prices of alcoholic beverages, KRS 244.380 et seq., is distinguishable, for its constitutional validity rests on the broad legislative power to regulate and control intoxicating liquor. See Reeves v. Simons, 289 Ky. 793, 160 S.W. 2d 149.

A significant feature of the present statute is that it is confined to products bearing a trade-mark, brand or name. The enactment of such statutes and the decisions upholding them rest in a large measure upon the concept that good will of the owners of the trade-mark, brand or name continues to adhere to the commodity until it reaches the ultimate consumer and that the owner is entitled to protect its good will by controllng the price of the product.

Beyond that concept, particularly with respect to the section relating to persons who are parties to such contracts, the courts have upheld the law as having a constitutional objective that is within the police power of a state in order to preserve the general welfare of the people and as not delegating legislative power or depriving a person of his property without due process of law. But a number of courts hold to the contrary and say that the act is arbitrary, monopolistic, invades the right of property, and constitutes an unlawful delegation of governmental power.

Putting aside the opinions of other courts with their diversities, which rest in some cases upon different constitutional provisions of the particular states, we turn to our own constitution and general public policy.

We are not concerned with the economic and social philosophy of such laws or the wisdom of the legislation. We are concerned only with the question of whether it is within the power of the Legislature under the Kentucky constitution to enact a statute which sanctions the fixing of minimum retail prices as described. The question is divisible. One part relates to the approval of an express contract made with a retailer directly or indirectly. The other relates to a retailer who is not a party to such a contract. The right to judicial relief from violation of such a contract and such a prohibition is, of course, implicit in the legal question.

■■  First section, KRS 365.080. This part of the statute declares that a contract of the kind described shall not be deemed to be in violation of any law of this state. It is apparent, therefore, that the premise of the statute is that such a contract might or would otherwise be monopolistic or an illegal restraint of trade. Section 198, *Kentucky Constitution*, imposes the duty upon the General Assembly to enact such laws as it deems necessary to prevent trusts and other combinations formed "to depreciate below its real value any article, or to enhance the cost of any article above its real value." This constitutional provision is not self-executing. The General Assembly is left to its discretion to determine the need for legislation upon the subject. Owen County Burley Tobacco System v. Brumback, 128 Ky. 137, 107 S.W. 710; Gay v. Brent, 166 Ky. 833, 179 S.W. 1051. Various statutes dealing with trade practices are embraced in Chapter 365 of the Kentucky Revised Statutes. The present statute does not appear to conflict with any other. If it does, of course, it is, nevertheless, within the power of the Legislature to enact the statute unless it offends § 198 or some other provision of the Constitution, such as being an unreasonable discrimination, which is barred by § 3. The same would be true if the statute should be regarded as different from the common law applying to contracts in re-

straint of free trade. In any event, as stated in Ely Lilly & Co. v. Saunders, 216 N.C. 163, 4 S.E.2d 528, 125 A.L.R. 1308, the common law, prior statutes and the public policy growing out of them all must yield to the superior authority of a later enacted statute which declares the particular character of contract shall not be deemed unlawful.

The circuit court expressed the opinion that these GE contracts with its dealers do not constitute a monopoly within the meaning of § 198 of the Constitution, but that the section is an expression of public policy of the state against price fixing. We agree that these contracts are not to be regarded as a monopolistic scheme of price fixing. The economists and the courts recognize a difference between what are termed "*horizontal*" and "*vertical*" price maintenance agreements. The former are cross-agreements between competitors or between the same class of persons, such as producers and wholesalers, or persons or concerns in competition with each other with like commodities. The latter are agreements between a producer or manufacturer of a particular commodity and those handling the product, in a straight line down to and including the retailer. Seagram Distillers Corp. v. Old Dearborn Distributing Co., 363 Ill. 610, 2 N.E.2d 940, affirmed 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109, 106 A.L.R. 1476; Ely Lilly & Co. v. Saunders, supra. The present scheme is regarded as "vertical" price fixing. In Commonwealth v. Grinstead, 111 Ky. 203, 63 S.W. 427, 56 L.R.A. 709, we held that a contract of this character was not within the purview of the Kentucky anti-monopoly statute (since repealed). However, the Congress seems to have regarded it necessary to enact the Miller-Tydings Act in 1937 and declare that nothing contained in the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, should render illegal vertical agreements which prescribe minimum prices for the resale of trademarked commodities when contracts or agreements of that description are lawful as applied to intrastate transactions under

local law. Note, 19 A.L.R.2d 1141. It may be added that some authorities and a strong dissenting opinion in Ely Lilly & Co. v. Saunders, 216 N.C. 163, 4 S.E.2d 528, 125 A.L.R. 1308, regard the scheme as not only authorizing *vertical* price fixing but as permitting an extensive network of *horizontal* contracts since the vendor may agree with the vendee that he will not sell to any other wholesaler unless that wholesaler first agrees not to resell to any wholesaler, retailer, or consumer who will not carry out, by further contracts or otherwise, the price maintenance plan embodied in the first contract.

■ With this generally accepted view of the nature of price fixing agreements and in recognition of the general liberty of contract which citizens of this country have, we conclude that the first section of the statute, KRS 365.080, is constitutional.

Second section, KRS 365.090. This section makes a dealer who does not sign a price maintenance agreement just as amenable to the law as one who does sign. The statute enforces price fixing not only against parties to a contract but also against a nonsigner if he willfully and knowingly breaches any agreement which had been made between a producer and a third person. It can be enforced against all retailers once a single retailer agrees with a distributor located anywhere, at home or abroad, on the resale price of an article of commerce. Under this law where GE has contracted with "A" that he will not sell an electric coffee pot for less than a stipulated price, if "B" acquires such a coffee pot with the GE brand upon it and offers to sell or does sell it for less than the price that "A" agreed he would, then "B" may be enjoined and penalized in damages. It applies whether or not "B" knew about the agreement when he acquired the article.

It will be readily agreed that GE's brand upon its manufactured articles is a symbol of its good will, which has been acquired through costly advertising and the intrinsic value of its products. Though intangible, this is indeed a valuable property right. The company is entitled to protection of its good will and its trade mark and brands from infringement, impairment, misrepresentation or misappropriation. But if some other branded article does not have these factors back of it, the law would be just as operative.

The view that the nonsigner provision of these so-called Fair Trade statutes is constitutionally valid rests on the major premise that a cut rate in the arbitrarily fixed market price may cause customers to accuse the manufacturer of putting out a cheaper article (in the sense of being of comparatively little value) to compete with the goods which it sells them, or playing a double game and thereby damaging the producer. 2 Nims, Unfair Competition and Trade-Marks, p. 976, et seq.

The cases of the Supreme Court of the United States are not controlling as they relate to Federal Statutes. It may be observed, however, that in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, 19 A.L.R.2d 1119, the Supreme Court settled the previously disputed question and held that the Sherman Anti-Trust Act is violated by a state fair trade law which permits enforcement of an interstate price agreement for the maintenance of minimum resale prices against a retailer who is not a party to the agreement, but that the Miller-Tydings Act exempts from the Sherman Act voluntary agreements where such agreements are lawful under local law.

In order to keep the opinion within reasonable length, we refrain from reviewing the many cases in particular. They may be found in the American Law Reports as above cited. It will suffice to summarize the reasons assigned by the various courts.

*In support of the constitutionality of the nonsigner act*: (1) The primary object of the statute is to prevent willful assaults upon the manufacturer's good will. (2) The enactment is within the police power of the state to promote the general welfare and·

does not offend due process or equal protection provisions of the constitutions nor impair freedom of contract. (3) A nonsigner dealer, by virtue of voluntarily deciding to buy and sell the commodity on which a minimum price is fixed by a contract with other parties, elects to be bound by the contract. (4) It is not monopolistic in effect and does not offend constitutional provisions condemning monopolies, for it automatically ceases to operate where there is no competition with commodities of the same general class produced by others. (5) It does not delegate legislative power or power to fix a resale price on another's property so as to violate due process.

*Reasons for holding the nonsigner statute invalid:* (1) The statute is an illegal restriction upon the right of contract and disposition of one's own property. Without any purport to declare the business clothed or affected with a public interest, it destroys the property right of retailers to fix the prices at which they will sell their goods. (2) It stigmatizes as unfair an act that is untainted by deceit, oppression or unfair dealing and involves no assault upon the good will of the manufacturer. (3) It ignores the motivating purpose of the retailer, which may be merely to shave his margin of profit or otherwise and compels the consuming public to pay tribute to a retailer who, as an alert and efficient merchant, does not want to charge the fixed prices, the effect of which goes well beyond what has been called "predatory price cutting." (4) It grants special privileges and is an attempt to delegate power to fix prices, a power which the Legislature itself does not have in general, and this is done without laying down any standard or yardstick to be used. (5) It tends to establish a monopoly as it is in restraint of fair trade rather than in promotion of it. (6) It offends constitutional guaranties of a right of personal liberty and private property and allows a citizen to be deprived of his property without due process of law. (7) The right to contract or not contract is a property right protected by constitutional demand of due process of law. (8) It constitutes an unlawful exercise of the police power because the imposition upon a nonsigner to a price fixing contract bears no reasonable relationship to public health, safety, morals or the general welfare.

In the very late case of Union Carbide & Carbon Corp. v. Bargain Fair, 167 Ohio St. 182, 147 N.E.2d 481, 483, decided January 28, 1958, the court stated: "In recent years and in the light of present-day conditions, courts have become more critical of the fair trade acts and have invalidated parts of them with increasing frequency." The court, after citing representative cases upholding and cases striking down the nonsigner provisions of like statutes, held the nonsigner provision of Ohio to be invalid since it is "an unauthorized exercise of the police power in a matter unrelated to the public safety, morals or general welfare, delegates legislative power to private persons, unconstitutionally denies the owner of property the right to sell it on terms of his own choosing."

We need not accept the rationale of all these opinions which hold the nonsigner section of the statute to be invalid, but upon the whole we regard the reasons as better and more in accord with our own jurisdiction than the reasons assigned for sustaining the law.

Our Bill of Rights declares as one of "the great and essential principles of liberty and free government" and as "inherent and inalienable * * * the right of acquiring and protecting property." § 1, Fifth. This is free enterprise. Our economic system is founded upon competition—"the life of trade." It is an established principle that the constitutional guaranty of the right of property protects it not only from confiscation by legislative edicts and from the physical taking for public or private use, but also (subject to reasonable regulation based upon some reasonable ground for the public good) from any unjustifiable impairment or abridgement of this right, such as depriving the owner of

any of its essential attributes or such as restricts or interrupts its common, necessary or profitable use. City of Jackson v. Murray-Reed-Slone & Co., 297 Ky. 1, 178 S.W.2d 847. The right of the owner to fix the price at which his property shall be sold is an inherent attribute of the property itself. Tyson & Bro. United Theatre Offices v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236.

Supplemental to this property right provision is § 2 of the Constitution which forbids the exercise of arbitrary power of government over the "property of free men."

■ This statute, we think, is a legislative invasion of the broad constitutional liberty of the people to acquire and protect their property and engage in free trade.

When GE voluntarily sold its products to someone up the line from the retailer, it presumably received its own asking price. When ABC acquired those commodities with GE's brand and symbol upon them, the articles—brand and all—became the purchaser's property. If it chose to do so, it could, without violating this law or any other law, have given any of the articles away or have destroyed them, including the brand and GE's good will as well if that be deemed to have adhered to the product. But by selling those articles at a price which ABC deemed satisfactory to it, it comes under the condemnation of this statute. What is wrong with a man selling his own property for what he pleases? We think the statute is the antithesis of "fair trade." It forces price fixing. It is arbitrary for the Legislature to say that by force of law no person may sell or trade his own property for whatever he pleases, whether the sale be in "fair and open competition with commodities of the same general class produced by others" than a party to a contract with a third party or be in competition with commodities made or produced by a manufacturer who is not a party to such a contract.

We, of course, recognize that all business is subject to reasonable regulation, designed to protect the public interest. Though there may be some shadowy public interest in prohibiting price cutting to obtain a legitimate advantage over a competitor, we cannot agree that in the absence of a provision defining or requiring an evil intent the public interest is so great or is so affected or needs such protection as this statute attempts to afford. On balance, the overwhelming public interest and welfare is the right of free people to engage freely in competitive trade in commodities that may not be injurious to the general safety and welfare, such as are within special regulation under a proper exercise of the police power. We agree with the trial court that the overriding purpose of this statute is to sanction price fixing and that the protection of a brand name or symbol of the producer seems to have been incidental to that purpose.

■ Although the action authorized by the statute sounds in tort, it rests upon the legislative fiat that a nonsigner by force of law is bound by a contract of strangers. It would destroy the fundamental principle that the obligation of a contract is, in general, limited to the parties making it and cannot be imposed upon one not a party or in privity with a party or who has not in some legal way assented to the contract. One cannot be held liable for the breach of a contract of other parties merely because he knows of its existence. See Johnson v. Coleman, Ky., 288 S.W.2d 348.

■ While the term "freedom of contract" does not appear in the federal or state constitutions, it is always embraced in the meaning of "liberty" as employed in those instruments, and is safeguarded by the constitutional guaranty of "pursuit of happiness," so one has the right to refuse to accept a contract or to assume such liability as may be proposed. 11 Am.Jur., Constitutional Law, § 339; Kenton & Campbell Benev. Burial Ass'n v. Goodpaster, 304 Ky. 233, 200 S.W.2d 120.

Our conclusion is that the second section of the Act, that is KRS 365.090, is unconstitutional and the judgment to that effect is affirmed. We hold, as did the circuit court, that the first section of the statute, that is KRS 365.080, is constitutional.

The judgment is affirmed.